## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TOM WILSON, derivatively on behalf of STRONGHOLD DIGITAL MINING, INC., <br><br> Plaintiff, <br><br> vs. <br><br> GREGORY A. BEARD, WILLIAM B. SPENCE, RICARDO R. A. LARROUDÉ, SARAH P. JAMES, THOMAS J. PACCHIA, MATTHEW J. SMITH, and THOMAS R. TROWBRIDGE, IV, <br><br> Defendants, <br><br> and <br><br> STRONGHOLD DIGITAL MINING, INC., <br><br> Nominal Defendant. | **C.A. No.** 1:23-cv-7840 <br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Tom Wilson ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Stronghold Digital Mining, Inc. ("Stronghold" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Gregory A. Beard, William B. Spence, Ricardo R. A. Larroudé, Sarah P. James, Thomas J. Pacchia, Matthew J. Smith, and Thomas R. Trowbridge, IV (collectively, the "Individual Defendants," and together with Stronghold, the "Defendants") for breaches of their fiduciary duties as controlling shareholders, directors and/or officers of Stronghold, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Securities

Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Stronghold, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Stronghold's controlling shareholders, directors, and officers from July 27, 2021, to March 31, 2022 (the "Relevant Period").

2.      Stronghold is a New York-based, vertically integrated crypto asset mining company focused on mining Bitcoin. The Company wholly owns and operates two low-cost, environmentally beneficial coal refuse power generation facilities in Pennsylvania. Due to the Company's commitment to generating energy and managing assets sustainably, the Company purports to be one of the first vertically integrated crypto asset mining companies with a focus on environmentally beneficial operations.

3.      On July 27, 2021, the Company filed its registration statement on Form S-1 with the SEC to pursue its initial public offering ("IPO"). The Company subsequently made multiple amendments to the S-1 (the "Registration Statement"), which was declared effective on October 19, 2021.

4.      On October 20, 2021, Stronghold's shares began trading on the NASDAQ stock exchange under the ticker symbol "SDIG."

5.      On October 21, 2021, the Company filed its final prospectus pursuant on Form 424B4 with the SEC (the "Final Prospectus," and together with the Registration Statement, the "Offering Documents"). The Offering Documents touted the Company as having "[s]uperior access to Bitcoin miners with multiple miner procurement channels, including direct relationships with equipment manufacturers and partnerships with data center operators and other intermediaries." The Offering Documents further highlighted recent confirmed purchase orders for the acquisition of miners from multiple providers of Bitcoin miners to demonstrate the Company's purported "ability to leverage the breadth of our relationships to quickly expand our mining capacity." However, Defendants knew at the time that these representations were made that there was no way that the delivery schedules and quantities touted in the Offering Documents would be met. That included the first scheduled delivery, which would purportedly take place less than two weeks after the IPO.

6.      One of the main suppliers of miners for the Company was MinerVa Semiconductor Corp. ("MinerVa"). Indeed, MinerVa was Stronghold's biggest supplier. Leading up to and during the IPO, Defendants persistently engaged with MinerVa and knew that it was facing significant issues at its assembly facility in China, including power outages and restrictions that prevented miners from being assembled. Indeed, during the Relevant Period, the Company stated that it talked "to MinerVa every day[.]" Additionally, MinerVa had not sourced the necessary parts to make a substantial number of miners. As such, it was not possible for MinerVa to deliver its model MV7 miners for the Company according to the schedule set out in the Offering Documents.

7.      Furthermore, the Company also claimed, misleadingly, that MinerVa MV7 miners

would perform at 100 tera hash per second ("TH/s").[1] Internally, Defendants expected the miners to achieve 90% of that rate. Of course, later, investors would come to know that the miners actually performed well below either of those rates, at 50-70 TH/s. Given the unfavorable assembly conditions, the quality and performance of MinerVa's MV7 miners were exceedingly low and one in three miners was effectively defunct. Relatedly, because MinverVa's miners could not operate at the rates that the Company represented, Stronghold would not be capable of achieving its goal of 2,100 peta hash per second ("PH/s") across its two data centers by the end of 2021. Instead, it would achieve a mere 40% of that target. Thus, the Offering Documents were materially false and misleading at all relevant times.

8.      The Company completed its IPO on October 22, 2021, selling nearly 7.7 million shares at $19.00 per share and raising approximately $132.5 million in net proceeds.

9.      On March 29, 2022, after the market had closed, the Company announced its fourth quarter full year 2021 financial results in which it reported a net loss well below analysts' expectations of $17.5 million for the fourth quarter of 2021 and a net loss of $27.3 million for the full year 2021, along with a statement from Stronghold's Chief Executive Officer ("CEO") admitting that "[o]ver the past few months, we have [had] significant headwinds in our operations which have materially impacted recent financial performance." Specifically, Stronghold disclosed that "MinerVa['s] deliveries have been well short of the timelines in the contract" as "to-date we have only received approximately 3300 out of the 15,000 miners originally ordered from MinerVa that were scheduled for delivery by December, as they have continually fallen short of contractual and communicated delivery timelines." The Company maintained that while it "continues to have

---

[1] The term "hash rate" refers to the number of calculations performed/amount of data that can be processed per second.

active dialogue with MinerVa regarding its delivery schedule and operational capabilities," and continued to be "in near constant contact" with MinerVa, the Company could not "provide an update or a timeline on future deliveries, or if the Company can expect any future deliveries" of the MinerVa miners.

10.     On this news, Stronghold's share price dropped $3.28 (or 32%) from a close of $10.25 per share on March 29, 2022, to a close of $6.97 per share on March 30, 2022. The Company's stock price has continued a downward spiral. As the Company would later reveal, by March 31, 2022, Stronghold had recognized an impairment of over $12.2 million for the remainder of miners yet to be received from MinerVa.

11.     Shortly thereafter, the Company announced that its Chief Financial Officer ("CFO") would be departing by May 15, 2022.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements and omissions regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) MinerVa would not be able to complete projected deliveries on time given that its facility in China where the miners were to be assembled was riddled with operational issues; (2) consequently, Stronghold could not achieve anticipated target hash rates; (3) the Company's recent confirmed purchase orders were not a reliable metric for imputing the Company's ability to quickly expand mining capacity; (4) the Company's ability to expand its Bitcoin mining capacity as touted in the Offering Documents was untenable; (5) as a result, the Company would likely incur substantial losses; and (6) the Company failed to maintain internal

controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

15.     In light of the Individual Defendants' misconduct, which has subjected the Company, its President and CEO, its former Co-Chairman, and its former CFO to being named as defendants in a federal securities class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), which recently overcame motions to dismiss, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefited from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

16.     In October 2022, the Company was forced to refinance and existing equipment financing agreement between Stronghold and WhiteHawk Finance LLC ("WhiteHawk") that had been contingent, in part, on MinerVa's deliveries.

17.     On June 30, 2023, MinerVa had refunded, swapped into deliveries, of the value of 12,700 of the 15,000 miners the Company was supposed to obtain by January 2022. MinerVa is currently in breach of the arrangement with Stronghold and the Company is evaluating "all available remedies."

18.     On August 10, 2023, the Court in the Securities Class Action largely denied the motions to dismiss the amended complaint filed in that action, holding that: "given the power outages at MinerVa's facilities and MinerVa's belated acquisition of necessary parts for the miners, as well as that Stronghold had not yet made its final payment for the miners at the time of the IPO, Plaintiffs have plausibly alleged Stronghold could not have "anticipated" receiving the miners according to the timeline in the Offering Materials."

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's President and CEO's, former Co-Chairman's, and former CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Stronghold's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

21.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Securities Act.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     The Court has personal jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District to justify the exercise of jurisdiction over them.

25.     Venue is proper in this District because Stronghold is headquartered in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

26.     Plaintiff is a current shareholder of Stronghold common stock. Plaintiff has continuously held Stronghold common stock since he first purchased shares on October 20, 2021, before the completion of the IPO.

**Nominal Defendant Stronghold**

27.     Stronghold is a Delaware corporation with its principal executive offices at 595 Madison Avenue, 28th Floor, New York, New York 10022. Stronghold's shares trade on the NASDAQ under the ticker symbol "SDIG."

**Defendant Beard**

28.     Defendant Gregory A. Beard ("Beard") has served as Stronghold's CEO, President, and Chairman of the Board since March 2021. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 29, 2022 (the "2022 Proxy Statement"), as of April 29, 2022, Defendant Beard beneficially owned 153,600 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 29, 2022 was $3.90, Defendant Beard owned approximately $599,040 worth of

Stronghold stock as of that date.

29.     Furthermore, Defendant Beard serves as one of the managing members of Q Power LLC ("Q Power"), which, according to the Company's Schedule 14A filed with the SEC on April 28, 2023 (the "2023 Proxy Statement"), has shared voting power and shared dispositive power over 26,057,600 shares of the Company's common stock, consisting of 14,400 shares of Class A common stock and 26,057,600 shares of Class V common stock. As managing members possess all voting and investment power over the shares of common stock held by Q Power, Defendant Beard thus holds 452.92% in combined voting power,[2] making him a controlling shareholder.

30.     For the fiscal year ended December 31, 2021, Defendant Beard received $4,582,324 in total compensation, including $230,769 in salary and $4,351,555 in option awards. For the fiscal year ended December 31, 2022, Defendant Beard received $493,615 in total compensation, comprised solely of salary, given that in 2022, Defendant Beard's performance share unit awards ("PSUs") were cancelled and that, at the end of 2022, Defendant Beard tellingly agreed to separate his $600,000 salary to a cash salary of $58,500 per year and $542,000 in equity compensation "[i]n an effort to align Mr. Beard's compensation with that of the stockholders."

31.     The 2023 Proxy Statement said the following of Defendant Beard, in relevant part:

*Gregory A. Beard* has served our Chief Executive Officer, President and Chairman of our Board of Directors (the "Board") since March 2021. Mr. Beard was the Global Head of Natural Resources, a Senior Partner, Member of the Management Committee, and Senior Advisor at Apollo Global Management from 2010 to 2020. In such roles, Mr. Beard oversaw Apollo's investment activities in the energy, metals and mining and agriculture sectors. Prior to Apollo, Mr. Beard was a senior Managing Director at Riverstone Holdings, an energy, power and infrastructure-focused private equity firm. He began his career as a Financial Analyst at Goldman Sachs, where he played an active role in energy-sector principal investment activities. The funds where Mr. Beard held these senior

---

[2] According to the 2023 Proxy Statement, combined voting power represents the "percentage of voting power of our Class A common stock and Class V common stock voting together as a single class."

leadership positions have invested billions of dollars in natural resources related investments. During his career, Mr. Beard sourced and managed some of the most profitable deals in the energy private equity sector. Mr. Beard is a founding and managing member of Q Power. Additionally, he currently serves as the Chief Executive Officer of Beard Energy Transition Acquisition Corp. (the "Beard SPAC"), a special purpose acquisition company currently in registration. He also currently serves on the board of directors of Scrubgrass Reclamation Company, L.P. (f/k/a Scrubgrass Generating Company, L.P.) ("Scrubgrass LP"), the board of directors/advisors of Double Eagle Energy Holdings III, Skeena Resources Ltd., Andros Capital Partners LLC, and Parallaxes Capital, as well as the board of directors of The Conservation Fund, a non-profit focused on land conservation. He previously served on the boards of more than 25 public and private companies, including Spartan Energy Acquisition Corp, (now Fisker Inc., NYSE: FSR), Athlon Energy, Inc. (NYSE: ATHL), CDM Resource Management, Mariner Energy, Apex Energy, Caelus Energy, CSV Midstream, Double Eagle I / II, EP Energy Corporation, Jupiter Resources, Roundtable Energy, Talos Energy Inc. (NYSE: TALO), Pegasus Optimization, Northwoods Energy and Tumbleweed Royalty. Mr. Beard received his Bachelor of Arts from the University of Illinois at Urbana. We believe Mr. Beard's extensive background in the energy industry makes him well qualified to serve on our Board.

**Defendant Spence**

32.     Defendant William B. Spence ("Spence") served as Co-Chairman of the Board from March 2021 until he retired on March 29, 2023. As of that date, the Company was negotiating an agreement with Defendant Spence to provide certain consulting services to Stronghold. According to the 2022 Proxy Statement, as of April 29, 2022, Defendant Spence beneficially owned 153,600 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 29, 2022 was $3.90, Defendant Spence owned approximately $599,040 worth of Stronghold stock as of that date.

33.     Furthermore, Defendant Spence serves as one of the managing members of Q Power LLC ("Q Power"), which, according to the 2023 Proxy Statement, has shared voting power and shared dispositive power over 26,057,000 shares of the Company's common stock, consisting of 14,400 shares of Class A common stock and 26,057,600 shares of Class V common stock. As managing members possess all voting and investment power over the shares of common stock held

by Q Power, Defendant Spence thus holds 40.97% in combined voting power, making him a controlling shareholder.

34.    For the fiscal year ended December 31, 2021, Defendant Spence received $4,351,555 in option awards, which also represents his total compensation from the Company for that year. For the fiscal year ended December 31, 2022, Defendant Spence received $600,000 in fees earned or cash paid.

35.    The 2022 Proxy Statement said the following of Defendant Spence, in relevant part:

*William B. Spence* has served as Co-Chairman of our Board since March 2021. Mr. Spence has been digitally mining crypto assets since 2018 and has over 40 years of energy-related experience. Mr. Spence has been involved with coal refuse reclamation since 1993. In 2007, Mr. Spence became the Chief Executive Officer of Targe Energy, a position he held until he resigned due to health reasons in 2017. Mr. Spence is a proud cancer survivor. Mr. Spence is a founding and managing member of Q Power and serves on the board of Scrubgrass LP. We believe Mr. Spence's background in coal refuse, and the energy industry generally, and his experience with mining crypto assets makes him well qualified to serve on our Board.

**Defendant Larroudé**

36.    Defendant Ricardo R. A. Larroudé ("Larroudé") served as Stronghold's CFO from March 2021 to May 15, 2022. According to the 2022 Proxy Statement, as of April 29, 2022, Defendant Larroudé beneficially owned 41,322 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 29, 2022 was $3.90, Defendant Larroudé owned approximately $161,156 worth of Stronghold stock as of that date.

37.    For the fiscal year ended December 31, 2021, Defendant Larroudé received $1,749,868 in total compensation, including $116,501 in salary, $350,000 in bonus, and $1,283,367 in option awards. For the fiscal year ended December 31, 2022, Defendant Larroudé received $94,216 in total compensation, comprised solely of salary. Subject to his separation

agreement with the Company, Defendant Larroudé was also eligible to receive a cash payment of $129,330 plus unused vacation days as of May 15, 2022, 92,975 shares of fully vested common stock, full vesting of all outstanding options, and reimbursement of the Company's portion for COBRA premiums for twelve months after his separation.

38.     The Registration Statement said the following of Defendant Larroudé, in relevant part:

> **Ricardo R. A. Larroudé** has served as our Chief Financial Officer since March 2021. Prior to that, in 2020, Mr. Larroudé was the General Manager of APFM Emerging Businesses division (a healthcare marketing company owned by General Atlantic and Silverlake), where he managed all non-core and international existing businesses and was responsible for the launch and acquisitions of new ventures. He joined APFM from Anheuser-Busch Inbev (a 3G Capital co-controlled company) where he lead the company's global financial risk management operations (including capital structure, forex and commodity management) and other merger and acquisition related responsibilities from 2017 to 2020. Prior to being a senior operating executive, from 2010 to 2017, Mr. Larroudé served at Apollo Global Management where he primarily focused on energy, metals and mining and agriculture related investments. During his private equity career, Mr. Larroudé was responsible for executing multiple investments, managing portfolio companies, starting new businesses, evaluating and executing rollup opportunities and managing investment exits. He began his career as an Investment Banking Analyst at Lehman Brothers' Global Communications and Media Group in 2003. Mr. Larroudé received his Bachelor of Business Administration degree from Fundação Getulio Vargas in São Paulo, Brazil.

**Defendant James**

39.     Defendant Sarah P. James ("James") has served as a Company director since October 2021. She also serves as a member of the Nominating and Governance Committee. According to the 2022 Proxy Statement, as of April 29, 2022, Defendant James beneficially owned 4,058 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 29, 2022 was $3.90, Defendant James owned approximately $15,826 worth of Stronghold stock as of that date.

40.     For the fiscal year ended December 31, 2021, Defendant James received $172,820

in total compensation, including $152,711 in option awards and $20,109 in stock awards. For the

fiscal year ended December 31, 2022, Defendant James received $148,599 in total compensation,

including a $53,599 in fees earned or cash paid and $95,000 in stock awards.

41.     The 2023 Proxy Statement said the following of Defendant James, in relevant part:

**Sarah P. James** has served as a member of our Board since October 2021.
Ms. James serves as the Chief Financial Officer of the Beard SPAC. March 2020
to July 2021, Ms. James served as Chief Financial Officer for Alussa Energy
Acquisition Corporation (NYSE: ALUS). Additionally, Ms. James serves as the
Chief Financial Officer of the Beard SPAC, a special purpose acquisition company
currently in registration. From February 2013 to April 2020, Ms. James served as a
vice president of finance and business development at Caelus Energy Alaska, LLC,
a private company specializing in oil and gas exploration and production.
Ms. James oversaw the company's business development strategy, debt and equity
fundraising and ongoing financial reporting functions. From January 2008 to
August 2010, she served as a private equity associate at Riverstone Holdings, an
energy, power and infrastructure-focused private equity firm. Prior to that,
Ms. James served as an analyst at JPMorgan Securities, Inc., in the diversified
industrials and natural resources group. Ms. James currently serves on the board of
directors of North American Helium Inc. Ms. James holds a Bachelor of Arts
degree in Economics and English from Duke University and a Master of Business
Administration and Master of Science: School of Earth Sciences from Stanford
University. We believe Ms. James' financial expertise and experience makes her
well qualified to serve on our board of directors.

**Defendant Pacchia**

42.     Defendant Thomas J. Pacchia ("Pacchia") has served as a Company director since

October 2021. According to the 2022 Proxy Statement, as of April 29, 2022, Defendant Pacchia

beneficially owned 6,689 shares of the Company's Class A common stock. Given that the price

per share of the Company's Class A common stock at the close of trading on April 29, 2022 was

$3.90, Defendant Pacchia owned approximately $26,087 worth of Stronghold stock as of that date.

43.     For the fiscal year ended December 31, 2021, Defendant Pacchia received $172,820

in total compensation, including $152,711 in option awards and $20,109 in stock awards. For the

fiscal year ended December 31, 2022, Defendant Pacchia received $137,879 in total compensation,

including a $42,879 in fees earned or cash paid and $95,000 in stock awards.

44.     The 2023 Proxy Statement said the following of Defendant Pacchia, in relevant

part:

> **Thomas J. Pacchia** has served as a member of our Board since October 2021.
> Mr. Pacchia is a Bitcoin and crypto asset specialist with over eight years of
> dedicated industry experience. In 2017, Mr. Pacchia founded HODL Capital, a
> digital asset hedge fund focused on the crypto and hash rate markets. Additionally,
> Mr. Pacchia serves as an advisor to a number of early stage companies building
> critical infrastructure across the crypto asset ecosystem. Prior to founding HODL
> Capital, Mr. Pacchia was a Director of Fidelity Investment's Bitcoin/Blockchain
> Incubator from 2016 to 2017 and a founding team member of Fidelity Digital Asset
> Services. Mr. Pacchia was also an early product developer at blockchain software
> company Digital Asset Holdings in 2015. Prior to his career in Bitcoin, Mr. Pacchia
> was a swap and derivative lawyer at Cadwalader Wickersham & Taft LLP from
> 2012 to 2013. Mr. Pacchia holds an M.Sc. in Finance from New York University's
> Stern School of Business, a J.D. from Washburn University School of Law, an
> L.L.M. in Intellectual Property from Maastricht University, and a Bachelor of Arts
> degree from Trinity College. We believe Mr. Pacchia's experience in the crypto
> industry makes him well qualified to serve on our Board.

### Defendant Smith

45.     Defendant Matthew J. Smith ("Smith") has served as a Company director since

November 2021 and as CFO since April 18, 2022. According to the 2022 Proxy Statement, as of

April 29, 2022, Defendant Smith beneficially owned 4,286 shares of the Company's Class A

common stock. Given that the price per share of the Company's Class A common stock at the

close of trading on April 29, 2022 was $3.90, Defendant Smith owned approximately $16,715

worth of Stronghold stock as of that date.

46.     For the fiscal year ended December 31, 2021, Defendant Smith received $148,574

in total compensation, including $136,346 in option awards and $12,228 in stock awards. For the

fiscal year ended December 31, 2022, Defendant Smith received $92,115 in total compensation,

including $72,116 in fees earned or cash paid and $20,000 in stock awards.

47.     The 2023 Proxy Statement said the following of Defendant Smith, in relevant part:

***Matthew J. Smith*** has served as the Chief Financial Officer of the Company since 2022 and remains a member of the board of directors. Previously, he served as the Founder and Managing Partner of Deep Basin Capital LP since January 2017. Mr. Smith has over 16 years of investment management experience in the energy, renewable, power and utility sectors across both public and private investments, including the roles of portfolio manager at Citadel's Surveyor Capital Ltd. from June 2010 through January 2016, senior analyst in the energy and other cyclical sectors for Highfields Capital Management LP from January 2009 to December 2009 and Copper Arch Capital LLC from July 2005 to December 2007, and as a financial analyst at Equity Office Properties Trust from August 2001 to May 2003. Mr. Smith is a CFA Charterholder. Mr. Smith currently serves as an independent director and audit committee member on the board of Spartan Acquisition Corp III (NYSE: SPAQ), a role that he has held since May 2021. He holds a M.S. in Finance from the University of Wisconsin-Madison's Applied Security Analysis Program (ASAP) and a B.B.A. from the University of Iowa Tippie College of Business. We believe Mr. Smith is well qualified to serve as a director due to his extensive experience in the energy, renewable, power and utility sectors across both public and private investments.

### Defendant Trowbridge

48.     Defendant Thomas R. Trowbridge, IV ("Trowbridge") has served as a Company director since October 2021. According to the 2022 Proxy Statement, as of April 29, 2022, Defendant Trowbridge beneficially owned 4,058 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 29, 2022 was $3.90, Defendant Trowbridge owned approximately $15,826 worth of Stronghold stock as of that date.

49.     For the fiscal year ended December 31, 2021, Defendant Trowbridge received $151,420 in total compensation, including $141,311 in option awards and $20,109 in stock awards. For the fiscal year ended December 31, 2022, Defendant Trowbridge received $150,057 in total compensation, including $55,057 in fees earned or cash paid and $95,000 in stock awards.

50.     The 2023 Proxy Statement said the following of Defendant Trowbridge, in relevant part:

***Thomas R. Trowbridge, IV*** has served as a member of our Board since October 2021. Mr. Trowbridge is a co-founder of Fluence Labs, which has developed and

launched a decentralized computing protocol and programming language optimized for building, hosting and running peer-to-peer applications. From December 2019 to June 2020, Mr. Trowbridge served as President of Triterras, Inc. Prior to that, Mr. Trowbridge helped found and from 2017 to 2019 served as President of Hedera Hashgraph (HBAR) ("Hedera"), a leading enterprise-grade public ledger that is currently the most used distributed ledger with over 4 million transactions a day. As President, Mr. Trowbridge drove the business from concept to main net launch with a $124 million capital raise at a $6 billion valuation, a global team in eight countries, and a governing council that includes Google, LG, IBM, Deutsche Telekom, Nomura Holdings, Inc., DLA Piper and Tata Communications among others. Before launching Hedera, Mr. Trowbridge served as the Head of North American Marketing and started and managed the New York office for Odey Asset Management from 2013 to 2017. Prior to his time at Odey Asset Management, Mr. Trowbridge served as the Head of U.S. Marketing for Lombard Odier from 2010 to 2012. Mr. Trowbridge has been advising technology companies since 1996, when he started his career as an investment banker in the telecom group of Bear, Stearns & Co. and began investing in early-stage technology companies in 1998 as a member of the private equity and venture capital firm Alta Communications. Mr. Trowbridge received his Bachelor of Arts degree from Yale University and his MBA from Columbia University. We believe Mr. Trowbridge's experience in the crypto industry makes him well qualified to serve on our Board.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

51.     By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of Stronghold and because of their ability to control the business and corporate affairs of Stronghold, the Individual Defendants owed Stronghold and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Stronghold in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Stronghold and its shareholders so as to benefit all shareholders equally.

52.     Each controlling shareholder, director and officer of the Company owes to Stronghold and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors and/or officers of Stronghold, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

54.     To discharge their duties, the controlling shareholders, officers and directors of Stronghold were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

55.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors, and officers of Stronghold, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholders, officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

56.     As controlling shareholders, senior executive officers, and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management,

earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

57.     To discharge their duties, the controlling shareholders, officers and directors of Stronghold were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers, and directors of Stronghold were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Stronghold's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Stronghold conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Stronghold and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal

legal, financial, and management controls, such that Stronghold's operations would comply with all applicable laws and Stronghold's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)   exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)   examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58.   Each of the Individual Defendants further owed to Stronghold and the shareholders the duty of loyalty requiring that each favor Stronghold's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

59.   At all times relevant hereto, the Individual Defendants were the agents of each other and of Stronghold and were at all times acting within the course and scope of such agency.

60.   Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with Stronghold, each of the Individual Defendants had access to adverse, non-public information about the Company.

61.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein,

as well as the contents of the various public statements issued by Stronghold.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

62.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

63.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and the claims alleged in the Securities Class Action; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

64.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Stronghold was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

66.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Stronghold, and was at all times acting within the course and scope of such agency.

### STRONGHOLD'S CODE OF CONDUCT AND AUDIT COMMITTEE CHARTER

67.     The Company's Code of Conduct states that Stronghold's fundamental policy is "to conduct its business with honesty and integrity in accordance with the highest legal and ethical standards." Additionally, "[t]he Company's directors, officers and other employees must comply with the spirit as well as the letter of this Code."

68.     The Code of Conduct further provides that "[a]ll managers are responsible both for encouraging all employees under their supervision, regardless of level, to be familiar with this Code and for promoting compliance with this Code."

69.     Under the section, "Books and Records," the Code of Conduct instructs, in relevant part: "The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions.  As such, the Company's books, records and accounts must accurately and fairly reflect the Company's transactions in reasonable detail and in accordance with the Company's accounting practices and policies."

70.     Under the section, "Employee Conduct," the Code of Conduct states, in relevant part:

No director, officer or other employee of the Company is permitted to willfully, directly or indirectly:

- Falsify, or cause to be falsified, any book, record or account of the Company;
- Make, or cause to be made, any materially false or misleading statement or omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which the statements were made, not misleading to an accountant in connection with (a) any audit or examination of the Company's financial statements or (b) the preparation or filing of any document or report required to be filed by the Company with the SEC or other governmental agency; or
- Take any action to fraudulently influence, coerce, manipulate or mislead the Company's independent registered public accounting firm.

Director, officers and other employees must exercise reasonable due diligence in order to avoid the events described above. If an employee believes that the Company's books and records are not being maintained in accordance with these requirements, the employee should follow the procedures outlined in the Company's Whistleblower Policy.

71.     Under the section, "Disclosure Controls," the Code of Conduct states, in relevant part:

It is the Company's policy to promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications made by the Company. If established, a disclosure committee should consider the materiality of information and determine disclosure obligations on a timely basis and oversee the Company's internal controls and shall take actions that are necessary and appropriate to fulfill the Company's disclosure requirements

72.     Under the section, "Reporting Violations," the Code of Conduct instructs, in relevant part:

The Company proactively promotes ethical behavior.

Directors, officers and other employees should report violations of applicable laws, rules and regulations (including, without limitation, the listing requirements of The Nasdaq Stock Market LLC ("Nasdaq")), this Code or any other code, policy or procedure of the Company (including, without limitation, the Company's Financial Code of Ethics) to appropriate personnel or follow the procedures outlined in the Company's Whistleblower Policy (as appropriate).

73.     The Company's Audit Committee Charter also entrusts the Individual Defendants

on the Audit Committee with additional responsibilities. The Audit Committee Charter states, in relevant part:

**Purposes**

The purposes of the Committee are to:

- Oversee the accounting and financial reporting processes of the Company and audits of the Company's financial statements.
- Assist the Board in fulfilling its oversight responsibilities regarding the:
    - Integrity of the Company's financial statements;
    - Company's compliance with legal and regulatory requirements
    - Qualifications, independence and performance of the independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (the "independent registered public accounting firm");
    - Effectiveness and performance of the Company's internal audit function;
- Annually, prepare an Audit Committee Report and publish the report in the Company's Proxy Statement or Annual Report on Form 10-K, as applicable, in accordance with applicable rules and regulations; and
- Perform such other functions as the Board may assign to the Committee from time to time.

74.     The Audit Committee Charter also delegates the Audit Committee, *inter alia*, with the following responsibilities, in relevant part:

*Other Powers and Responsibilities*

3.   The Committee shall receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures.

\*        \*        \*

7.   The Committee may meet separately with management on a periodic basis to discuss matters related to the Company's internal control over financial reporting and other related matters to the Company's internal audit function.

8.   The Committee will review and discuss with management and the independent registered public accounting firm the Company's report on internal control over financial reporting prior to filing the Company's Annual Report on Form 10-K.

9. The Committee will discuss with management the Company's guidelines and policies with respect to risk assessment and risk management. In addition, the Committee will discuss with management the Company's significant financial risk exposures and the actions management has taken to monitor and control such exposures.

*      *      *

13. The Committee will prepare for inclusion in the Company's Proxy Statement or Annual Report on Form 10-K, as applicable, the report required by the rules of the SEC.

14. The Committee will review the Company's Code of Conduct and its enforcement at least annually.

15. The Committee will review the Company's Financial Code of Ethics and its enforcement at least annually.

16. The Committee will review the adequacy and succession planning of the Company's accounting and financial personnel at least annually.

75.     In violation of the Code of Conduct and the Company's corporate governance documents, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, the aiding and abetting thereof, as well as for contribution under Section 11(f) of the Securities Act and 21D of the Exchange Act. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with applicable laws and regulations, and exercise reasonable due diligence in avoiding the events outlined under the "Employee Conduct" section of the Code of Conduct. In violation of the Audit Committee Charter, the Individual Defendants on the Audit Committee failed to fulfill their responsibilities in overseeing, *inter alia*, the Company's compliance with legal and regulatory requirements and the Company's systems of internal control.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background on the Company and Mining Bitcoin

76.     Stronghold is a New York-based crypto asset mining focused on mining Bitcoin. The Company also wholly owns and operates two low-cost, environmentally beneficial coal refuse power generation facilities in Pennsylvania which convert coal refuse, a waste byproduct of legacy coal mining operations, into power used to mine Bitcoin. Due to the Company's commitment to generating its own energy and managing assets sustainably, the Company purports itself to be one of the first vertically integrated crypto asset mining companies with a focus on environmentally beneficial operations.[3]

77.     "Mining" Bitcoin refers to the process of a computer verifying a transaction by solving a complicated puzzle of sorts to derive a solution—termed a "hash." The Company's Offering Documents maintained that solutions to such puzzles "essentially requires random guesswork" so a computer must be able to "generate millions of guesses" to find the right answer and add "blocks" to the blockchain, the reward for which is Bitcoin.

78.     The Bitcoin network used to reward miners with 50 new Bitcoins for each block added to the blockchain. That number has been cut in half every four years. Today, successful miners receive 6.25 Bitcoin for each block of transactions. The next "halving event" is set to take place in 2024 in order to achieve a 21 million cap on the total supply of Bitcoin by the year 2140.[4]

---

[3] Crypto asset mining and cryptocurrency refer to digital currency that is generated and exchanged via blockchain (i.e., interconnected blocks that create an online transaction that is then publicly accessible) technology. The first known cryptocurrency was Bitcoin. Since its release in 2009, several other cryptocurrencies have entered the market, but Bitcoin continues to be the most noteworthy. Its market capitalization as of September 2022 was over $387 million according to NASDAQ.

[4] https://www.blockchain-council.org/cryptocurrency/how-many-bitcoins-are
left/#:~:text=The%20mining%20reward%20for%20each,cap%20on%20the%20total%20supply.
Last visited August 28, 2023.

79.     Since 2009, the value of Bitcoin has risen from \$0 to a high of over \$67,000 in November 2021.[5] However, leading up to Stronghold's IPO, Bitcoin's valuation remained somewhat volatile. In fact, mining Bitcoin is a costly endeavor.[6] The greater computing capacity a miner has, the more chance that that operator will be the first to achieve a Bitcion for solving the right hash. Up to date mining machines use programs geared at mining Bitcoin specifically and are referred to as "miners." Computing power of a mining machine is measured by how many hashes it can compute. Companies, like Stronghold, that mine for Bitcoin do so on a large scale with data centers that house numerous miners. Miners all compete for the same hash and Bitcoin reward, so some operators combine their hash rate to increase their chances of solving a block and earning Bitcoin for adding to the blockchain. The greatest expense of such operations is the electricity used to keep miners consistently running. Thus, to successfully mine Bitcoin, miners need access to power, internet and must be in an environment conducive to consistently running (i.e., they must be protected from overheating and other elemental challenges). By locating mining operations near large power sources, companies mining Bitcoin can cut on electricity costs, which is vital to a Bitcoin mining company, like Stronghold.

80.     Stronghold owns and operates two power plants for its miners in Pennsylvania: Scrubgrass and Panther Creek. Indeed, leading up to its IPO, its two power plants were highlighted in the Company's Offering Documents as they were touted as "low-cost" and "environmentally friendly." The Offering Documents suggested that Stronghold had the capacity to mine Bitcoin at a fraction of its cost ("less than \$3,000 per Bitcoin [.]"). At the time of the IPO, each Bitcoin had

---

[5] https://www.investopedia.com/articles/forex/121815/bitcoins-price-history.asp.   Last   visited August 28, 2023.

[6] https://wp.decrypt.co/wp-content/uploads/2022/07/JPM_Flows___Liquidity_St_2022-07-13.pdf. Last visited August 28, 2023.

a value of just over $60,000.[7]

**Stronghold Prepares to Go Public**

81.     Leading up to the IPO, Stronghold communicated its anticipated delivery schedules

and hash capacity in its Offering Documents as follows:

> through the execution of definitive agreements since April 1, 2021 with three
> suppliers to purchase approximately 26,150 additional miners with a total hash
> capacity equal to over 2,500 PH/s. Approximately 72% of these miners are
> scheduled to be delivered in 2021, with the next batch scheduled for delivery in
> October 2021, 21% are scheduled to be delivered in the first quarter of 2022, and
> the remaining 6% are scheduled to be delivered during the remainder of 2022.

82.     On April 2, 2021, the Company entered into an agreement with MinerVa, whereby

MinerVa would provide Stronghold 15,000 model MV7 miners for cryptocurrency with a 1.5

million TH/s for a purchase price of $73,387,500 (the "Purchase Agreement"). The Purchase

Agreement placed MinerVa in the position of Stronghold's largest supplier at the time of the IPO.

Pursuant to the Purchase Agreement, MinerVa would ship at least 2,500 miners to the Company,

for delivery, by October 31, 2021; at least 5,000 miners by November 30, 2021; at least 5,000 by

December 31, 2021; and the rest of the 2,500 miners by January 2022.

83.     As disclosed in the Offering Documents, the Company would pay $73 million to

MinerVa in installments and had paid the first installment in April 2021, the second in June 2021,

collectively comprising 80% of the purchase price. 20% remained to be paid on the Purchase

Agreement and was due "one month before the shipping date."

84.     In June 2021, Stronghold raised $105 million from two private placements of equity

securities. Investors included MG Capital, various family offices, and Defendant Beard. The

Company also entered into a financing agreement with Whitehawk, a subsidiary of WhiteHawk

---

[7]https://www.statmuse.com/money/ask/bitcoin+price+in+october+2021#:~:text=The%20closing
%20price%20for%20Bitcoin,2010%2C%20and%20may%20be%20incomplete.   Last   visited
August 28, 2023.

Capital Partners, LP, to fund the Purchase Agreement between Stronghold and MinerVa.

85.     On July 27, 2021, the Company filed with the SEC its Registration Statement, which was subsequently subject to multiple amendments and declared effective by the SEC on October 19, 2021.

86.     An August 3, 2021 article published at *blockworks.co* titled "Stronghold Digital Mining Raises $74M, Plans to Buy Second Power Plant" reported that Stronghold had raised $74 million in lease financing to "fund purchases of bitcoin miners and to scale its expansion with a second power plant."

87.     On October 21, 2021, the Company filed its Final Prospectus pursuant to Rule 424(b)(4) with the SEC.

88.     In addition to its purported delivery schedules, the Offering Documents emphasized Stronghold's total has rate capacity, maintaining that it operated "approximately 3,000 crypto asset mining computers . . . with hash rate capacity of approximately 185 petahash per second ('PH/s'). A high hash rate is correlated with a mining fleet's ability to mine Bitcoin and thus, successfully turn profitable mining operations. The Offering Documents maintained that Stronghold's existing purchase agreements would increase its total hash rate "to over 2,100 PH/s by December 2021 and to over 8,000 PH/s by December 2022" representing a colossal projected growth rate in a mere two months and over the course of a year. Significantly, 71% of the total growth rate would be attributable to MinerVa's miners alone. Specifically, the Offering Documents stated that the 15,000 miners from MinerVa would have a total output of 1.5 million TH/s, indicating that each miner would have an output of 100 TH/s. Thus, in order to achieve its stated combined hash rate, it was paramount that MinerVa's miners operated at the expected hash rates.

**MinerVa Experiences Significant Operating Issues That Inhibits It from Shipping**

**Miners to the Company**

89.    Although the investing public remained unaware leading up to the IPO, between September 2021 and continuing through October 2021, at minimum, MinerVa's factories in China were regularly experiencing power outages and/or shut-downs because of an increased demand in China for manufactured products post-COVID-19. Regular power outages also resulted in raised costs for coal for electricity. Regulators in China did not allow utility rates to rise to account for the increased cost of coal, however. Instead, power plants were forced to shut down for hours or slow down their otherwise normal operations. Such power outages made it impossible for MinerVa to assemble and ship the MV7 miners. Defendants knew this before the IPO and at the time of the IPO and when the schedules set forth in the Offering Documents were published.

90.    Moreover, the power outages and facility closures prevented MinerVa from obtaining the necessary components to assemble the miners in the first place. Thus, when the IPO took place, it was no secret (to Defendants) that MinerVa was significantly behind schedule. Although the Offering Documents maintained that MinerVa would ship 7,500 miners by October 31, 2021—shortly after the IPO; at the time of the IPO, the Company had not received—and MinerVa had not shipped—even *one* miner under the Purchase Agreement. In fact, by November 2021, Stronghold had received only 240 miners from MinerVa, and a substantial portion of those were not operative.

**The IPO Closes, While Defendants Are Well Aware that the Company Will Not be Able to Perform as Promised**

*MinerVa's Facilities Were Subject to Persistent Outages and Other Constraints that Prevented Assembly*

91.    On October 22, 2021, the Company issued a press release announcing the completion of its IPO in which 7,690,400 shares of its Class A common stock were sold at $19.00 per share, raising approximately $132.5 million in net proceeds. The press release stated that

Stronghold intended to contribute the net proceeds to Stronghold Digital Mining Holdings LLC ("Stronghold LLC") in exchange for Class A common units of Stronghold LLC and that the proceeds would be used by Stronghold LLC for general corporate purposes, including for acquisitions of miners and power generating assets.

92.     Confidential witnesses cited in the Securities Class Action, referred to as "CW-1" "CW-2" and "CW-3" served as data center technicians and/or were seniors at the Company's data center at Panther Creek between early-to-mid October 2021 until May 2022, early-to-mid October 2021 until July 2022, and October 11, 2021, until May 2022, respectively. CW-1, CW-2, and CW-3 were responsible for unboxing miners from MinerVa and putting them in operation and confirmed that the Company did not have the miners promised in the Offering Documents. Moreover, this information was no secret to the Individual Defendants, who regularly and carefully assessed the MinerVa MV7 production and assembly operations through video conferences and/or phone calls with MinerVa, some of which were attended by CW-1 and CW-2. CW-1 confirmed that Stronghold's management engaged in these calls, including Defendants Beard and Spence. CW-1 maintained that the calls covered significant issues, including MinerVa's delays with shipping, inability to produce miners, and quality concerns with miners that were produced, among other things. Furthermore, the Company tracked the number of miners received and their quality/performance and compiled receipts from suppliers in Excel or Google spreadsheets that were shared through the Company's Microsoft Teams channel. According to CW-3, the Company also tracked the performance of miners after they were set up on the internet through a dashboard called Foundry. This application displayed the has rate for each miner every day that it operated as well as the total has rate for the entire set of miners the Company had.

93.     Indeed, according to CW-1, Defendants Larroudé and Beard (among others) visited

the Panther Creek facility once a month between October and December 2021, at least, and even more often in 2022. During these tours, Defendant Beard would sometimes take pictures and videos of the miners. As such, at all relevant times, they each were personally aware of how many miners the Company had received and the quality of those miners. CW-1 stated that in October 2021, Stronghold's management acknowledged that MinerVa did not have many miners and would not be able to provide the quantity the Company maintained within the disclosed timeline. Defendants later admitted that they knew MinerVa had been attempting to (without success) move its assembly operations to another location (outside the mainland of China) given persistent production issues and restraints. During a call with investors held on November 30, 2021, Defendant Beard stated that MinerVa "still need[ed] to figure out their assembly issues."

94.     Nonetheless, despite that MinerVa could not deliver the quantity of miners on the schedule it agreed to—and Defendants knew of this well before the IPO—Defendants represented as late as October 21, 2021, that MinerVa would deliver 2,500 of the expected 15,000 miners a mere 10 days after the IPO. The Company disclosed that MinerVa would be receiving units from a different China-based company, which itself was new, to assemble the miners. Thus, Defendants also knew that MinerVa did not have the necessary components to assemble the miners.

95.     Tellingly, Stronghold had not yet paid 20% of the Purchase Agreement by the time it filed its prospectus (October 21, 2021)—even though payment was due *one month* before the supposed shipping date of the miners, scheduled to *arrive* on October 31, 2021. Yet, the Company received the funds for the remaining 20% of the payment to MinerVa from WhiteHawk on June 30, 2021. The collateral for the loan secured by Stronghold were MinerVa's miners. Pursuant to Stronghold's financing agreement with WhiteHawk, WhiteHawk also received 63,092 warrants from the Company, which would allow WhiteHawk to later purchase shares of the Company

subject to MinerVa shipping the MV7 miners in accordance with the Purchase Agreement. For this additional reason, Defendants closely monitored MinerVa's deliveries—and delays. Given MinerVa's persistent failure, the Company was forced to amend the financing agreement with WhiteHawk, extend previous schedules, and pay a fee of $250,000.

96.     Also, under the Purchase Agreement and as provided in the Offering Documents, Stronghold was responsible for paying the shipping fees on miners sent by MinerVa. Accordingly, at the time of the IPO, Defendants would have known (or recklessly disregarded) that Stronghold had not yet paid for shipments of miners as of the IPO and, as such, there was no way that the Company would receive the quantity of miners promised by October 31, 2021.

### MinerVa's MV7 Miners Suffered from Quality Issues that Impacted Their Performance

97.     Aside from knowing that the Company would not be receiving the stated number of miners on the schedule provided to investors, Defendants also were aware that the miners Stronghold ultimately received were riddled with deficiencies and performed well below the expected hash rates. The Company would later disclose that "the performance of MinerVa's miners has been below expectations, with hash rates ranging from 50% to 70% of the expected capacity." As CW-1, CW-2 and CW-3 maintained, one of three miners was essentially "dead on arrival." The miners suffered from numerous problems, including failures with "power distribution units" This required the Company's data center technicians, including the CWs mentioned in the Securities Class Action, to "Frankenstein" miners that were defunct and use parts from those miners to use in other miners so that they could operate.

98.     As maintained in the Offering Documents, MinerVa's 15,000 miners were said to have a total hash rate of 1.5 million TH/s, which translates to 1,500 PH/s and a hash rate of 100 TH/s. In addition to expecting the Company to receive thousands of miners, investors were primed to believe that Stronghold would be able to achieve a total hash rate of 2,100 PH/s by December

2021. Unbeknownst to investors, the touted 100 TH/s rate was the maximum that the model MV7 miners could output and was more of a theoretical rate rather than a realistic figure. Defendants internally expected that the miners would operate at 90% of that figure, though even that expectation was unrealistic. In truth, the miners operated at 50%-70%, though this fact would remain hidden from the public until March 2022.

99.     The Company also maintained that MinerVa's miners were energy efficient. Specifically, Defendants stated that they would be using the "latest-generation miners" which had an efficiency of 37 joules per terahash. Not much information was available to the public about MinerVa's miners at the time of the IPO, but the Company sourced more than one model of MV7 miners from MinerVa, and its models did not all conform to the same efficiency rates. Indeed, some models had lower efficiency rates than others. It was clear based on the information available to Defendants at the time of the IPO and thereafter that the Company would not be able to reach the stated goal of 2,100 PH/s.

100.     Once again, Defendants were aware of and had significant access to data via Stronghold's software (dubbed "MinerVa Tools") that charted the hash rates of each miner, at individual, data center, and total levels. CW-1 and CW-3 from the Securities Class Action confirmed that once the Company received a miner from MinerVa, it would be connected to the internet, powered on, and run. Technicians were able to look up the IP address of each machine to see the details of a specific machine, including its hash rate and energy use. Through another application, "Foundry," the Company kept track of its fleet of miners at each (and both) of its facilities.  CW-1 confirmed that Stronghold's leadership, including Defendant Beard, had access to the application's dashboard. Defendant Beard referred to Foundry during tours of Stronghold's data centers. The Foundry dashboard was used to track the amount of Bitcoin Stronghold

successfully mined, as well, which represented the revenue Stronghold obtained from its mining operations. CW-2 confirmed that Stronghold had not reached 100% efficiency as late as December 2021 and stated that technicians were rushed between facilities to increase the hash rate output by miners that were underperforming or not even running.

**False and Misleading Statements**

101.    Under pertinent SEC rules and regulations, including Section 11, 15 U.S.C. § 77k, Item 303 of Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), and Item 105 of regulation S-K, 17 C.F.R. § 229.105, Defendants were obligated to disclose certain known and material information, such as ongoing trends, risks, and uncertainties, that would reasonably impact the Company's operations. This, they utterly failed to do. Instead, Defendants failed to disclose material information in the Offering Documents and account for actualized material risks—namely, that MinerVa, Stronghold's most significant supplier, was experiencing debilitating issues with operating its facilities, assembling and/or sourcing parts for miners that prevented it from performing under the Purchase Agreement and consistent with Defendants' representations.

*Offering Documents*

102.    On July 27, 2021, the Company filed the Registration Statement on Form S-1 with the SEC, which was signed by Defendants Beard, Larroudé, and Spence. The Registration Statement was amended on October 19, 2021, and declared effective the same day.

103.    On October 21, 2021, the Company filed its Final Prospectus on Form 424B4. The day prior, the Company's Class A shares began trading on NASDAQ.

104.    Regarding Stronghold's Purchase Agreement with MinerVa, the Offering Documents maintained the following, in relevant part:

On April 2, 2021, the Company entered into a purchase agreement (the "Minerva Purchase Agreement") with Minerva Semiconductor Corp ("Minerva") for the acquisition of 15,000 of their MV7 ASIC SHA256 model cryptocurrency miner equipment (miners) *with a total terahash to be delivered equal to 1.5 million terahash (total terahash)*. The price per miner is $4,892.50 for an aggregate purchase price of $73,387,500 to be paid in installments. The first installment equal to 60% of the purchase price, or $44,032,500, was paid on April 2, 2021, and an additional payment of 20% of the purchase price, or $14,677,500, was paid June 2, 2021. The remaining 20% is still owed and is scheduled to be made one month before the shipping date. The seller anticipates shipping no less than 15,000 miners by January 2022. *Anticipated delivery quantities and timeframe will be no less than 2,500 miners by October 31, 2021, no less than 5,000 miners by November 30, 2021, no less than 5,000 by December 31, 2021, and the remaining 2,500 by January 2022.* The aggregate purchase price does not include shipping costs, which are the responsibility of the Company and shall be determined at which time the miners are ready for shipment.

(Emphasis added.)[8]

105.    The Offering Documents described in greater detail the Company's purchase agreement with MinerVa Semiconductor Corp., a distributor of crypto miners:

On April 2, 2021, the Company entered into a purchase agreement (the "Minerva Purchase Agreement") with Minerva Semiconductor Corp ("Minerva") for the acquisition of 15,000 of their MV7 ASIC SHA256 model cryptocurrency miner equipment (miners) with a total terahash to be delivered equal to 1.5 million terahash (total terahash). The price per miner is $4,892.50 for an aggregate purchase price of $73,387,500 to be paid in installments. The first installment equal to 60% of the purchase price, or $44,032,500, was paid on April 2, 2021, and an additional payment of 20% of the purchase price, or $14,677,500, was paid June 2, 2021. The remaining 20% is still owed and is scheduled to be made one month before the shipping date. The seller anticipates shipping no less than 15,000 miners by January 2022. *Anticipated delivery quantities and timeframe will be no less than 2,500 miners by October 31, 2021, no less than 5,000 miners by November 30, 2021, no less than 5,000 by December 31, 2021, and the remaining 2,500 by January 2022.* The aggregate purchase price does not include shipping costs, which are the responsibility of the Company and shall be determined at which time the miners are ready for shipment.

(Emphasis added.)

---

[8] The statements with added emphasis in this section are alleged herein to have been materially false and misleading.

106.    However, as explained above, the delivery schedule and quantities detailed in the Offering Documents were false, as Defendants knew that there was no way the Company would receive the number of miners asserted during the timeframes disclosed. The stated "Delivery Timeframe" in the Offering Documents was "Oct. '21-Jan. '22" for the miners MinerVa would purportedly supply to the Company.

107.    The Offering Documents further highlighted the Company's capacity to expand its mining operations—supported by the purchase orders made with MinerVa, stating that: "While many of our competitors have struggled to obtain mining equipment due to historically strong demand and pre-sold supply, *we believe that these recent confirmed purchase orders demonstrate our ability to leverage the breadth of our relationships to quickly expand our mining capacity*." Such statement painted a false image of the Company, as it appeared that it was not, in fact, "struggle[ing] to obtain mining equipment," and further, that "recently confirmed" purchase order, including the Company's largest order from MinerVa, were on track given that they "demonstrate our *ability to …quickly expand* our mining capacity." (Emphasis added.)

108.    These statements were materially false and misleading as they failed to disclose, *inter alia*, that: (1) MinerVa would not be able to complete projected deliveries on time given that its facility in China where the miners were to be assembled was riddled with operational issues; (2) consequently, Stronghold could not achieve anticipated target hash rates; (3) the Company's recent confirmed purchase orders were not a reliable metric for imputing the Company's ability to quickly expand mining capacity; (4) the Company's ability to expand its Bitcoin mining capacity as touted in the Offering Documents was untenable; (5) as a result, the Company would likely incur substantial losses; and (6) the Company failed to maintain internal controls. As a result of

the foregoing, the Company's public statements were materially false and misleading at all relevant times.

109.    The Registration Statement additionally cautioned that "if" suppliers failed to provide the agreed-upon miners, as the Company anticipated, Stronghold's operations "could" be materially impacted:

> ***We are dependent on third-party brokers and direct suppliers to source some of our miners, and failure to properly manage these relationships, or the failure of these brokers or suppliers to perform as expected, could have a material adverse effect on our business, prospects or operations.***
>
> We currently rely on third-party brokers and direct suppliers to source some of our miners. We have no assurance that business interruptions will not occur as a result of the failure by these brokers or suppliers to perform as expected, including the failure to locate acceptable or sufficient miners for our purchase. Many of the competitors in our industry have also been purchasing mining equipment at scale, which has caused a world-wide shortage of mining equipment and extended the corresponding delivery schedules for new miner purchases. ***We cannot ensure that our brokers or suppliers will continue to perform services to our satisfaction or on commercially reasonable terms. The recent increased demand for miners has also limited the supply of miners that brokers may source for us.*** Our brokers or suppliers may also decline our orders to fulfill those of our competitors, putting us at competitive harm. There are no assurances that any miner manufacturers will be able to keep pace with the surge in demand for mining equipment. Further, resource constraints or regulatory actions could also impact our ability to obtain and receive miners. For example, China has been experiencing power shortages, and certain of our miner suppliers have been impacted by related intermittent power outages. Additionally, certain companies, including Bitmain, may move their production of miners out of China and into other countries following the September 2021 blanket ban on crypto mining and transactions by Chinese regulators. Such power outages and production relocations could result in cancellations or delays and may negatively impact our ability to receive mining equipment on a timely basis or at all. ***If our brokers or suppliers are not able to provide the agreed services at the level of quality and quantity we require or become unable to handle the volume of miners we seek, we may not be able to replace such brokers or suppliers in a timely manner.*** Any delays, interruption or increased costs could have a material adverse effect on our business, prospects or operations.

(Emphasis added.) (First emphasis in original.)

110.    These boilerplate risk disclosures were materially false and misleading, as they indicated that such risks and adverse events had not already come to pass when the reality was the

opposite. Moreover, Defendants failed to disclose that MinerVa, Stronghold's largest supplier, was saddled with serious problems that impacted its ability to operate, assemble, and deliver miners pursuant to the Purchase Agreement. Such issues rendered it impossible for MinerVa to deliver the quantity of miners to Stronghold according to the schedules agreed upon and disclosed. Defendants were in constant communication with MinerVa, upon their own admission, and thus, knew that MinerVa would not be able to deliver the miners by October 31, 2021 (a mere 10 days after the IPO) or November 30, 2021, or even the end of the year in December 2021.

111.    The Offering Documents also materially misrepresented Stronghold's operating capacity. As stated in the Offering Documents, Stronghold would use a portion of the IPO proceeds to procure approximately 55,800 additional miners, which *we anticipate will bring our total hash rate capacity to over 2,100 PH/s by December 2021* and to over 8,000 PH/s by December 2022. (Emphasis added.)

112.    The aforementioned statements were materially false and misleading because they failed to disclose that: (1) MinerVa would not be able to complete projected deliveries on time given that its facility in China where the miners were to be assembled was riddled with operational issues; (2) consequently, Stronghold could not achieve anticipated target hash rates; (3) as a result, the Company would likely incur substantial losses; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

113.    The Offering Documents included Stronghold's existing hash rates to support Defendants' representations regarding Stronghold's purported growth plans and expectations. MinerVa's MV7 miners were specifically highlighted, with the Offering Documents maintaining that Stronghold had "entered into an agreement with a leading manufacturer of Bitcoin miners to

purchase 15,000 miners *with aggregate has rate of approximately 1,500 PH/s* for delivery between October 2021 and January 2022." (Emphasis added.)

114.   The Offering Documents further described the Purchase Agreement as follows: "[o]n April 2, 2021, the Company entered into a purchase agreement (the "Minerva Purchase Agreement") with Minerva Semiconductor Corp ("Minerva") for the acquisition of 15,000 of their MV7 ASIC SHA256 model cryptocurrency miner equipment (miners) *with a total terahash to be delivered equal to 1.5 million terahash (total terahash)*." (Emphasis added.) This meant that each MV7 miner would have a hash rate of 100 TH/s.

115.   These statements were materially false and misleading, as they failed to disclose that: (1) MinerVa's MV7 miners could only operate at 90% under realistic conditions and the Company only expected 90 TH/s output by these miners as a result; (2) given the actual capacity each MinerVa MV7 miner had, the Company would not be able to reach a total hash rate of 2,100 PH/s by the end of the year (2021); and (3) thus, the Company's Bitcoin operations would not be mining Bitcoin and generating revenue thereby. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge as False and Misleading Statements Persist**

116.   Shortly after the IPO, on November 8, 2021, the Company reported on a Form 8-K filed with the SEC that it had closed its Panther Creek facility and that it had not received *any* miners from MinerVa, although a very small percentage was purportedly en route (240 miners). The same day, the Company issued a press release published on its website announcing the Panther Creek closure and its impact on related services agreement. No mention was made about the MinerVa miners.

*November 30, 2021 8-K and Form 10-Q*

117.    On November 30, 2021, the Company filed a current report on Form 8-K with the

SEC, attaching a press release, disclosing Stronghold's highlights for the third fiscal quarter ended

September 30, 2021. Determined to downplay the recent news about MinerVa, the highlights

included the following:

**Third Quarter and Recent Operational and Financial Highlights**

• Removed approximately 106,000 tons of coal refuse and returned approximately 64,500 tons of beneficial use ash to waste coal piles during the quarter, facilitating the remediation of these sites

• Closed upsized initial public offering ("IPO") on October 22, 2021, generating net proceeds of approximately $132.5 million

• Closed acquisition of Panther Creek Plant on November 2, 2021, increasing owned power generation capacity to approximately 165 megawatts ("MW")

• As of November 29, 2021, has received nearly 6,000 miners with total hash rate capacity of approximately 470 petahash per second ("PH/s") and remains on track to achieve its hash rate capacity goal of 8,000+ PH/s by the end of 2022

• Pro forma cash and cash equivalents as of September 30, 2021 was approximately $104.2 million, as adjusted for net proceeds from the IPO, closing of the Panther Creek Plant acquisition, and deposits paid in relation to announced miner purchases.

118.    The press release also disclosed how many miners Stronghold had received as of

September 30, 2021:

As of September 30, 2021, the Company had approximately 3,000 miners deployed with total hash rate capacity of approximately 185 PH/s. As of November 29, 2021, the Company has purchased or installed approximately 45,000 miners with total hash rate capacity of approximately 4,390 PH/s…. Since the end of the third quarter, Stronghold has received nearly 3,000 miners, including the first 240 MV7 miners from MinerVa, and the Company expects to have over 500 MinerVa miners installed by the end of the week, with shipments ramping up for the 15,000-miner order. Performance for these machines has been in line with expectations.

119.    The same day, the Company hosted an earnings call with investors during which

Defendant Beard reassured that "we are actively receiving commercial quantities of miners under

our agreements with MinerVa …. ***With respect to MinerVa, we have 240 MV7 miners plugged***

*in currently and expect to have over 500 plugged in by the end of this week. We had expected all 15,000 MinerVa miners to be received late this year or early next year, and this is still the case."*

120.    During the call, Defendant Larroudé aligned with Defendant Beard, maintaining that:

> At the end of the third quarter, we had about 3,000 miners employed with total hash rate capacity of roughly 185 petahash. From the end of the quarter through November 29, we received nearly 3,000 additional miners with total hash rate capacity of approximately 285 petahash, more than doubling our hash rate capacity in less than 2 months.
>
> ***These miners include 240 MinerVa MV7 miners, and we expect to have by over 500 by the end of the week***. ... ***We're in consistent contact with MinerVa*** ... and expect to receive the balance of the miners under these agreements over the next few months.

121.    One analyst pushed back and asked for more details on what Defendants were hearing from MinerVa regarding the 15,000 miners, including whether the supplier provided information on what issues it was facing and how those issues would be overcome. Defendant Beard confirmed the delays in MinerVa's assembly capacity, and the power outages experienced, stating:

> **Gregory A. Beard**
> President, CEO & Co-Chairman of the Board
> ... So I don't want to, beyond my quarterly conference call, sort of make representations on behalf of MinerVa. I'll tell you what they have told us, and we believe them, is that their constraint comes largely from having an assembly center that has been part of an industrial park that has experienced power curtailments, which – that's concerning.
>
> In spite of that, they're still shipping miners to us and hopefully others, and they're now starting to show up. And they're working as expected on the spec that we paid for. And in fact, today, I posted on -- I'm aware that there are rumors out there saying, "Hey, is Minerva -- are they going to be able to deliver all of this? Does this company really even exist?" So for that reason, I posted on LinkedIn pictures of one of our StrongBoxes full of MinerVa miners that have been delivered and/or running. And hey, we'll be doubling that quantity by the end of the week -- this week actually. And so they're coming.

So the curtailment of power impacted one facility. We talk to MinerVa every day. We are aware of the other facilities that they are trying to move their assembly operations to and believe that they will be successful in ramping up assembly outside of Mainland China to be able to produce, I would say, industrial quantities of these machines.

I can tell you that -- I don't think they've done it yet. So I think right now, we're still – it's still dribs and drabs out of that one facility. But because we have – we are not passive in this effort. We're actively trying to both understand and push and help MinerVa with that assembly issue.

                                    ***

So it's a – it's a pretty bad fraud if they're actually shipping miners. So that's the -- and I'm aware -- I've been made aware of what some folks are saying about MinerVa. Again, not representing them, but – and it's certainly not issue free. But we do believe that we're going to get all 15,000 miners in the first quarter of next year. For that to happen, they still need to figure out their assembly issues. But having helped them and worked with them, I think they're going to do it. [Sic.]

122.    Defendant Beard further commented on Stronghold's prior expectations and representations, stating that:

I think also, just from your modeling standpoint and ours, like we're presuming that we get only 1,500 of these miners by the end of this year. So it is not like we're assuming that we're going to get 15,000 and our growth is going to be limited by MinerVa. They are a small part of the picture this year. And overall, I think they're going to be a relatively small part of our story. They're a part of it because I think we got what we feel like a good deal on those machines. But obviously, them being late, that hurts us.

So it's not a position that we want to be in, but we are reliant on a single producer of these things. I'm not sure what your question was, but that was -- I want to make sure I said those things.

123.    Also on November 30, 2021, the Company filed its quarterly report with the SEC for the fiscal quarter ended September 30, 2021 on Form 10-Q (the "3Q21 10-Q"). It was signed by Defendant Larroudé and contained certifications signed by Defendants Beard and Larroudé, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the 3Q21 10-Q, the disclosure of any

material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

124.    The 3Q21 10-Q disclosed that Stronghold paid the remainder of the Purchase Agreement out to MinerVa on October 26, 2021—although it had not received the miners promised to date.

125.    Still, the 3Q21 10-Q repeated substantially similar details of the Company's purchase agreement with MinerVa, including the delivery schedules:

> On April 2, 2021, the Company entered into a purchase agreement with MinerVa Semiconductor Corp ("MinerVa") for the acquisition of 15,000 of their MV7 ASIC SHA256 model cryptocurrency miner equipment (miners) with a total terahash to be delivered equal to 1.5 million terahash (total terahash). The price per miner is $4,892.50 for an aggregate purchase price of $73,387,500 to be paid in installments. The first installment equal to 60% of the purchase price, or $44,032,500, was paid on April 2, 2021, and an additional payment of 20% of the purchase price, or $14,677,500, was paid June 2, 2021. As of September 30, 2021, the remaining 20% is still owed (refer to Note 23 - Subsequent Events for disclosure of the Company paying this final deposit in October 2021). ***The seller anticipates shipping no less than 15,000 miners by January 2022. Anticipated delivery quantities and timeframe will be no less than 2,500 miners by October 31, 2021, no less than 5,000 miners by November 30, 2021, no less than 5,000 by December 31, 2021, and the remaining 2,500 by January 2022.*** The aggregate purchase price does not include shipping costs, which are the responsibility of the Company and shall be determined at which time the miners are ready for shipment.

(Emphasis added).

126.    The 3Q21 10-Q also purported to warn of the following risk factor:

> ***We are dependent on third-party brokers and direct suppliers to source some of our miners, and failure to properly manage these relationships, or the failure of these brokers or suppliers to perform as expected, could have a material adverse effect on our business, prospects or operations.***
>
> We currently rely on third-party brokers and direct suppliers to source some of our miners. We have no assurance that business interruptions will not occur as a result of the failure by these brokers or suppliers to perform as expected, including the failure to locate acceptable or sufficient miners for our purchase. Many of the competitors in our industry have also been purchasing mining equipment at scale, which has caused a world-wide shortage of mining equipment and extended the

corresponding delivery schedules for new miner purchases. We cannot ensure that our brokers or suppliers will continue to perform services to our satisfaction or on commercially reasonable terms. ***The recent increased demand for miners has also limited the supply of miners that brokers may source for us.*** Our brokers or suppliers may also decline our orders to fulfill those of our competitors, putting us at competitive harm. There are no assurances that any miner manufacturers will be able to keep pace with the surge in demand for mining equipment. Further, resource constraints or regulatory actions could also impact our ability to obtain and receive miners. For example, China has been experiencing power shortages, and certain of our miner suppliers have been impacted by related intermittent power outages. Additionally, certain companies, including Bitmain, may move their production of miners out of China and into other countries following the September 2021 blanket ban on crypto mining and transactions by Chinese regulators. Such power outages and production relocations could result in cancellations or delays and may negatively impact our ability to receive mining equipment on a timely basis or at all. ***If our brokers or suppliers are not able to provide the agreed services at the level of quality and quantity we require or become unable to handle the volume of miners we seek, we may not be able to replace such brokers or suppliers in a timely manner.*** Any delays, interruption or increased costs could have a material adverse effect on our business, prospects or operations.

(Emphasis added) (First emphasis in original).

127.    These boilerplate risk disclosures were materially false and misleading, as they indicated that such risks and adverse events had not already come to pass or downplayed the same. Moreover, Defendants failed to disclose that it would be impossible for MinerVa to deliver the quantity of miners to Stronghold according to the schedules agreed upon and disclosed. Defendants were in constant communication with MinerVa, upon their own admission, and thus, knew that MinerVa would not be able to deliver the miners by the end of the year in December 2021 or January 2022. Consequently: (1) Stronghold could not achieve anticipated target hash rates; (2) the Company's recent confirmed purchase orders were not a reliable metric for imputing the Company's ability to quickly expand mining capacity; (3) the Company's ability to expand its Bitcoin mining capacity as touted in the Offering Documents was untenable; (4) as a result, the Company would likely incur substantial losses; and (5) the Company failed to maintain internal

controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### March 29, 2022 Form 10-K

128.    On March 29, 2022, the Company filed its annual report with the SEC for the fourth quarter and full year ended December 31, 2021 on Form 10-K (the "2021 10-K"). The 2021 10-K was signed by each of the Individual Defendants and contained SOX certifications signed by Defendants Beard and Larroudé, attesting to the accuracy of the 2021 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

129.    The 2021 10-K also purported to warn of the following risk factor:

***We are dependent on third-party brokers and direct suppliers to source some of our miners, and failure to properly manage these relationships, or the failure of these brokers or suppliers to perform as expected, could have a material adverse effect on our business, prospects or operations.***

We currently rely on third-party brokers and direct suppliers to source some of our miners. We have no assurance that business interruptions will not occur as a result of the failure or delay by these brokers or suppliers to perform as expected, including the failure to locate acceptable or sufficient miners for our purchase, even if we have paid for the miners partially or in full at the time of order or at any point prior to delivery. One of our suppliers has failed to deliver contractually obligated miners, which has resulted in a significantly lower than expected hash rate and has had a material adverse effect on our business as of the year end and is expected to continue into 2022. Many of the competitors in our industry have also been purchasing mining equipment at scale, which has caused a world-wide shortage of mining equipment and extended the corresponding delivery schedules for new miner purchases. We cannot ensure that our brokers or suppliers will continue to perform services to our satisfaction or on commercially reasonable terms. ***The recent increased demand for miners has also limited the supply of miners that brokers may source for us.*** Our brokers or suppliers may also decline our orders to fulfill those of our competitors, putting us at competitive harm. There are no assurances that any miner manufacturers will be able to keep pace with the surge in demand for mining equipment. Further, resource constraints or regulatory actions could also impact our ability to obtain and receive miners. For example, China has been experiencing power shortages, and certain of our miner suppliers have been impacted by related intermittent power outages. Additionally, certain companies,

including Bitmain and MinerVa, may move their production of miners out of China and into other countries following the September 2021 blanket ban on crypto mining and transactions by Chinese regulators. Such power outages and production relocations could result in cancellations or delays and may negatively impact our ability to receive mining equipment on a timely basis or at all. Additional and escalating wars, strife and unrest around the globe could also negatively impact our business and the ability of our suppliers to deliver miners. ***If our brokers or suppliers are not able to provide the agreed services at the level of quality and quantity we require or become unable to handle the volume of miners we seek, we may not be able to replace such brokers or suppliers in a timely manner.*** Any delays, interruption or increased costs could have a material adverse effect on our business, prospects or operations.

(Emphasis added) (First emphasis in original).

130.    The 2021 10-K further claimed: "We believe that these recent confirmed purchase orders demonstrate our ability to leverage the breadth of our relationships to expand our mining capacity."

131.    The statements referenced above herein were materially false and misleading for the reasons outlined above. Defendants persistently failed to disclose material facts necessary to make the statements made not false and misleading, including, *inter alia*, that: (1) the Company's recent confirmed purchase orders were not a reliable metric for imputing the Company's ability to expand mining capacity; (2) the Company's ability to expand mining capacity as touted in the Offering Documents was untenable; (3) as a result, the Company would likely incur substantial losses; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

132.    In January 2022, the Company was forced to amend its agreement with WhiteHawk, as it still had not received the miners that MinerVa was scheduled to supply. In exchange for amending the agreement, the Company paid a fee of $250,000. In a current report filed on Form 8-K with the SEC on January 6, 2022, the Company acknowledged that it had only received 1000 miners from MinerVa to date.

## The Truth Emerges

### *March 29, 2022 Press Release and Conference Call*

133.    On March 29, 2022, after the market closed, the Company issued a press release disclosing its financial results for the fourth quarter and full year ended December 31, 2021. The Company reported a net loss of $17.5 million for the fourth quarter of 2021, compared to a net income of $0.2 million for the same quarter a year ago, as well as a net loss of $27.3 million for the full year 2021 compared to a net loss of $0.1 million in the prior year period. The press release also quoted Defendant Beard, in relevant part:

> Over the past few months, ***we have faced significant headwinds in our operations which have materially impacted recent financial performance and have led us to re-assess our near-term growth plans. We no longer believe targeting 8.0 EH/s by the end of 2022 is achievable***, given the current circumstances, and we will focus on installing and optimizing the performance of the miners that we have already ordered while maximizing our financial flexibility.

134.    Under the section titled "Cryptocurrency Mining Update," the press release revealed the following, in relevant part:

> As of December 31, 2021, Stronghold had received approximately 14,700 miners with total hash rate capacity of 1.3 EH/s, of which more than 8,000 miners were hashing over 0.8 EH/s. For the fourth quarter of 2021, Stronghold averaged a hash rate of approximately 0.3 EH/s, and, for the first quarter of 2022, the Company estimates it will average a hash rate of approximately 0.9 EH/s. As of March 24, 2022, the Company had received approximately 25,200 miners with total hash rate capacity of approximately 2.3 EH/s, of which approximately 20,500 miners were hashing approximately 1.9 EH/s.
>
> ***The Company's hash rate has been negatively impacted by delays in miner deliveries, delays in datacenter buildout, and operational challenges at its Scrubgrass power plant (the "Scrubgrass Plant"). To date, Stronghold has only received approximately 3,300 of the total 15,000 miners ordered from MinerVa, despite an initial delivery deadline of December 31, 2021.*** This delivery deadline was later revised to April 30, 2022 based on communications with MinerVa. Stronghold continues to have active dialogue with MinerVa regarding its delivery schedule and operational capabilities, but the Company does not have sufficient information from MinerVa to provide an update or a timeline on future deliveries, or if the Company can expect any future deliveries. ***Additionally, the performance***

*of MinerVa's miners has been below expectations, with hash rates ranging from 50% to 70% of the expected capacity, compared to 90%+ for a standard performing machine.* The Company is actively working to improve MinerVa miner performance and evaluating all appropriate avenues to extract value from the MinerVa miners and contract.

*          *          *

Stronghold continues to expand its datacenter capacity as part of its vertically integrated business model. The Company has manufactured 101 one-megawatt ("MW") StrongBoxes, its modular datacenter containers, as of March 24, 2022. While manufacturing of StrongBoxes has progressed as planned, *there have been delays in third-party datacenter deliveries associated with a joint venture, which contributed to lower hash rates in the fourth quarter of 2021 and the beginning of 2022. To date, only four of 24 datacenter containers have been commissioned under the joint venture.*

(Emphasis added).

135.    That same day, March 29, 2022, the Company held an earnings call in which it discussed the Company's financial results for the fourth quarter and full year ended December 31, 2021. On the call, Defendant Beard stated, in relevant part:

Now moving to Slide 8, *there are two key factors that have negatively impacted our operations and near-term growth trajectory.* We estimate these factors collectively created a $40 million to $45 million reductions in cash flow to date, relative to our base case plan. As many of you know, we placed an order for miners with a miner manufacturer called MinerVa in 2021. Additionally, MinerVa presented a compelling value proposition for the price of roughly $50 per terahash, a significant discount to prevailing market rates.

However, to-date *we have only received approximately 3300 out of the 15,000 miners originally ordered from MinerVa that were scheduled for delivery by December, as they have continually fallen short of contractual and communicated delivery timelines.* Based on what we know today in our recent communications with MinerVa, we cannot provide any definitive guidance after the timing of future deliveries. We are evaluating all appropriate avenues to extract value from MinerVa and also proactively removed all MinerVa and miners from the collateral-based supporting our equipment financing agreements.

Additionally, operations with our datacenter build-out partner have progressed slower than expected. *Miner deliveries associated with the build-out were moderately delayed and commissioning of the datacenter has progressed slower-than-expected, largely driven by delayed deliveries of the datacenter pods with*

48

*only four of the 24 pods currently operational*, relative to plans to have all 24 commissioned by year-end 2021.

(Emphasis added).

136.    Defendant Beard confirmed during the earnings call that the Company had been in "near constant contact" with MinerVa and admitted that the miners received to date had not proven to be reliable.

137.    On this news, Stronghold's share price dropped $3.28 (or 35%) from a close of $10.25 per share on March 29, 2022 to a close of $6.97 per share on March 30, 2022.

138.    As set forth in the Company's quarterly report filed on May 16, 2022 with the SEC for the first fiscal quarter ended March 31, 2022, Stronghold recognized an impairment charge totaling $12,228,742 and indicated that it no longer expected MinerVa to deliver any miners.

139.    On April 14, 2022, the Company issued a press release announcing the departure of its CFO, Defendant Larroudé, to "pursue other business interests" effective May 15, 2022. Stronghold's stock price has continued to trade at low rates and the Company's valuation has declined 75% since trading at $19 during its IPO.

**The Court in the Securities Class Action Denies Motions to Dismiss the Complaint Nearly in Full**

140.    On August 10, 2023, the Court in the Securities Class Action denied in part defendants' motions to dismiss the Amended Class Action Complaint for Violation of the Federal Securities Laws. Specifically, all claims survived, other than Section 12(a)(2) claims made by one of the plaintiffs who was found to have lacked standing to pursue those claims.

141.    In so doing, the Court found that the plaintiffs plausibly alleged that "Stronghold's statement that it 'anticipated' the delivery of miners described in the Offering Materials was materially false or misleading at the time of the IPO." This conclusion was supported by the

following facts, most which also provide support for similar statements made after the IPO regarding Stronghold's expectations that MinerVa would deliver the amount of miners pursuant to earlier agreed-upon schedules and quantities, among other things. The Court's order highlighted the following, in relevant part:

> First, Stronghold stated in the Offering Materials that the outstanding payment for the MinerVa miners was due "one month before the shipping date," but Stronghold had not yet made that payment as of October 21, 2021, just ten days before 2,500 MinerVa miners were supposed to be delivered. Compl. ¶ 78. The Complaint thus plausibly alleges that, contrary to Stronghold's assertions in the Offering Materials, it could not have "anticipated" receiving "2,500 miners by October 31, 2021" given that it had not yet paid for them. *Id.* ¶ 80.

> Second, from September 2021 through at least October 2021, power cuts and outages resulted in factory closures across China, including at the facility where MinerVa assembled the MV7 miners. *Id.* ¶¶ 68, 69. Plaintiffs allege that those power outages, which occurred "prior to and at the time of the IPO," "prevented the assembly and shipping of MinerVa MV7 miners to Stronghold" and "render[ed] it impossible to meet the delivery schedule represented in the Offering Materials." *Id.* ¶ 69. Third, according to the Complaint, MinerVa did not have the necessary parts to construct the miners Stronghold had ordered. Plaintiffs allege that on October 21, 2021, the date of the Prospectus filing, the China-based company AGM Group Holdings Inc. announced that it "agreed to supply [MinerVa] with 25,000 units of its 100 TH/s MinerVa MV7 ASIC to build the MinerVa family of crypto miners," thus raising a plausible inference that MinerVa was unable to construct and deliver the miners Stronghold ordered at the time of the IPO. *Id.* ¶ 77.

***

> But the allegations in the Complaint suggest that MinerVa and Stronghold were in contact at the time of the IPO. For example, Plaintiffs allege that according to CW-1, the Individual Defendants held regular conference calls with MinerVa on Zoom and Microsoft Teams, and although CW-1 began participating in those calls "around the end of 2021," he "was aware that regular calls had been occurring for some time prior thereto." *Id.* ¶ 73. Those calls included discussions about MinerVa's shipping delays and the "quality problems with the miners it was producing." *Id.* On the March 29, 2022 earnings call, Defendant Beard stated that Stronghold was "in near constant contact" with MinerVa and that "we probably talk to [MinerVa co-founder] Mar[c] Ma on an either daily basis by phone or by text," and that he had "been with us on site in Pennsylvania for probably ten days in the past of the past 30 [sic]." *Id.* ¶ 141. In any event, even if Stronghold and MinerVa were not regularly communicating at the time of the IPO, the lack of contact between the companies does not necessarily demonstrate that the conditions that led to the shipment delays were "unknowable" at the time, and more properly

50

constitutes one of the affirmative defenses available under Sections 11 and 12.

\*\*\*

…Stronghold warned in the Offering Materials that "power outages and production relocations could result in cancellations or delays and may negatively impact our ability to receive mining equipment on a timely basis or at all." Thau Decl. Ex. 4, 5. But given Plaintiffs' allegations that those risks had already occurred, the warnings are unavailing: the Complaint alleges that Stronghold had not yet paid for the final shipment of miners and that the power outages were so severe that the miner shipment schedule was not possible at the time of the IPO. As such, "[b]ecause Defendants' statements were hypothetical" and the warned-of risks were not, the cautionary statements "are not curative."

\*\*\*

In sum, given the power outages at MinerVa's facilities and MinerVa's belated acquisition of necessary parts for the miners, as well as that Stronghold had not yet made its final payment for the miners at the time of the IPO, Plaintiffs have plausibly alleged Stronghold could not have "anticipated" receiving the miners according to the timeline in the Offering Materials.

(*See* Securities Class Action, ECF No. 77 at 16-19.)

## DAMAGES TO STRONGHOLD

142.   As a direct and proximate result of the Individual Defendants' conduct, Stronghold has lost and expended, and will lose and expend, many millions of dollars.

143.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of its current and former officers and directors, any governmental investigations, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

144.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

145.   Further, the Company was forced to recognize a lofty impairment charge for the remaining MinerVa miners in 2022 of over $12.2 million and has been subjected to additional fees associated with revising its financing agreement with WhiteHawk given its default.

146.   As a direct and proximate result of the Individual Defendants' conduct, Stronghold

has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment and other violations of law.

## DERIVATIVE ALLEGATIONS

147.    Plaintiff brings this action derivatively and for the benefit of Stronghold to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of Stronghold, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, the aiding and abetting thereof, as well as for contribution under Section 11(f) of the Securities Act and 21D of the Exchange Act.

148.    Stronghold is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

149.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Stronghold. Plaintiff will adequately and fairly represent the interests of Stronghold in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

150.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

151.    A pre-suit demand on the Board of Stronghold is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Beard, James, Pacchia, Smith, Trowbridge (the "Director-Defendants") and nonparties Indira

Agarwal and Thomas Dohtery (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of these seven Directors.

152.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

153.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. Each of the Directr-Defendants served as members of the Board during the Relevant Period and had ready access to pertinent information regarding MinerVa's operations and its miners, as discussed above. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

154.     Additional reasons that demand on Defendant Beard is futile follow. Defendant Beard has served as the Company's CEO, President, and Chairman of the Board since March 2021. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Beard with his principal occupation for which he receives handsome compensation as detailed above. As CEO, President, and Chairman of the Board, Defendant Beard was ultimately responsible for the many false and misleading statements and omissions that were made, including those made during conference calls and contained in the 3Q21 10-Q, which he signed SOX

certifications for, and the 2021 10-K, which he personally signed and signed SOX certifications for. Moreover, Defendant Beard signed, and thus personally made, the false and misleading statements contained in the Registration Statement. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Beard is a defendant in the Securities Class Action. For these reasons, Defendant Beard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.    Additional reasons that demand on Defendant James is futile follow. Defendant James has served as a Company director since October 2021. She also serves as the Chair of the Nominating and Governance Committee and served as a member of the Audit Committee during the Relevant Period. Defendant James has received and continues to receive substantial compensation for her role as a director as described above. Moreover, Defendant James signed, and thus personally made the false and misleading statements in the 2021 10-K. As a trusted Company director, Defendant James conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant James breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

156.    Additional reasons that demand on Defendant Pacchia is futile follow. Defendant Pacchia has served as a Company director since October 2021. He also serves as a member of the

Audit Committee and as a member of the Compensation Committee. Defendant Pacchia has received and continues to receive substantial compensation for his role as a director as described above. Moreover, Defendant Pacchia signed, and thus personally made the false and misleading statements in the 2021 10-K. As a trusted Company director, Defendant Pacchia conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Pacchia breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.    Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since October 2021 and as CFO since April 18, 2022. He also served as the Chair of both the Audit and Compensation Committees but resigned once he was appointed to the position of CFO. Defendant Smith has received and continues to receive substantial compensation for his role as a director as described above. Moreover, Defendant Smith signed, and thus personally made the false and misleading statements in the 2021 10-K. As a trusted Company director, Defendant Smith conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Smith breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant Trowbridge is futile follow. Defendant Trowbridge has served as a Company director since October 2021. He also serves as

the Chair of the Compensation Committee and as a member of the Nominating and Governance Committee. Defendant Trowbridge has received and continues to receive substantial compensation for his role as a director as described above. Moreover, Defendant Trowbridge signed, and thus personally made the false and misleading statements in the 2021 10-K. As a trusted Company director, Defendant Trowbridge conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Trowbridge breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand on the Board is futile follow.

160.    Demand in this case is excused because the Directors, all but two of whom are named as defendants in this action, are beholden to and controlled by Defendants Beard and Spence, who serve as managing members of Q Power and thus possess all voting and investment power over the shares of common stock held by Q Power, providing them with a combined voting power of over 40% as of March 1, 2023. As Q Power holds more than 45% of the voting power for the election of directors of the Company, the Company is considered a controlled company within the meaning of NASDAQ corporate governance standards. Accordingly, as stated in the 2021 10-K, Q Power has the power to "substantially influence matters requiring our stockholder or Board approval, including the election of directors, approval of any potential acquisition of us, changes to our organizational documents and significant corporate transactions, and certain decisions we make as the managing member of Stronghold LLC."  Moreover, as long as Q Power continues to own a majority of the Company's voting stock, "Q Power will be able to cause or

prevent a change of control of us or a change in the composition of our Board and could preclude any unsolicited acquisition of us." Thus, as managing members of Q Power, Defendants Beard and Spence wield significant control over the continued employment of the Directors, especially Defendant Smith, who is also an executive of the Company. Defendants James, Pacchia, and Trowbridge, as well as non-parties Indira Agarwal and Thomas Doherty, are also beholden to Defendants Beard and Spence because of the compensation they receive as Directors. As a result, the Directors are unable to evaluate a demand with disinterest or independence due to Defendants Beard and Spence's control over them.

161.    Moreover, the Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, as a member of Q Power, Defendant Trowbridge answers to and is beholden to Defendants Beard and Spence, who both serve as managing members of Q Power. Defendants Beard and Spence have also served together on the board of directors of Scrubgrass L.P., which is one of the two coal refuse power generation facilities that generates power for the Company's mining operations. Defendant James is also especially beholden to Defendant Beard given their history of having concurrently served on the board of directors and/or as managers of the same companies over the course of the past decade. From February 2013 to April 2020, Defendant James served as a vice president of finance and business development at Caelus Energy LLC, of which Defendant Beard served on the board of directors. Defendant Beard and James also had overlapping tenures at Riverstone Holdings LLC, where Defendant Beard served as a senior Managing Director and Defendant James served as a private equity associate. Notably, since November 23, 2021, Defendant James has served as the CFO and Chief Accounting Officer of Beard Energy Transition

Acquisition Corp. ("BETAC"), a blank check company where Defendant Beard previously served as CFO and Chief Accounting Officer and has served as Chairman of the board of directors and as CEO since February 2021. After the completion of BETAC's initial business combination, Defendant James stands to be paid consulting or management fees from the combined company. Due to her pecuniary interest, Defendant James is beholden to Defendant Beard. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

162.    In violation of the Code of Conduct and the Audit Committee Charter, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting, and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, and waste of corporate assets. In violation of the Code of Conduct and the Audit Committee Charter, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

163.    Stronghold has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Stronghold any part of the damages Stronghold suffered and will continue to suffer thereby. Thus, any demand

upon the Directors would be futile.

164.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

165.    The acts complained of herein constitute violations of fiduciary duties owed by Stronghold officers and directors, and these acts are incapable of ratification.

166.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Stronghold. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Stronghold, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

167.    If there is no directors' and officers' liability insurance, then the Directors will not cause Stronghold to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

168.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

169.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Stronghold's business and affairs.

171.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

172.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Stronghold.

173.    In breach of their fiduciary duties owed to Stronghold, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) MinerVa would not be able to complete projected deliveries on time given that its facility in China where the miners were to be assembled was riddled with operational issues; (2) consequently, Stronghold could not

achieve anticipated target hash rates; (3) the Company's recent confirmed purchase orders were not a reliable metric for imputing the Company's ability to quickly expand mining capacity; (4) the Company's ability to expand its Bitcoin mining capacity as touted in the Offering Documents was untenable; (5) as a result, the Company would likely incur substantial losses; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

174.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

175.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

176.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Stronghold's securities.

177.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the

Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

178.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

179.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Stronghold has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

180.   Plaintiff on behalf of Stronghold has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

181.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

182.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Stronghold.

183.   The Individual Defendants either benefited financially from the improper conduct or received bonuses, option awards, stock awards, or similar compensation from Stronghold that was tied to the performance or artificially inflated valuation of Stronghold, or received

compensation that was unjust in light of the Individual Defendants' bad faith conduct.

184.    Plaintiff, as a shareholder and a representative of Stronghold, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

185.    Plaintiff on behalf of Stronghold has no adequate remedy at law.

### THIRD CLAIM

### Against Individual Defendants for Abuse of Control

186.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Stronghold, for which they are legally responsible.

188.    As a direct and proximate result of the Individual Defendants' abuse of control, Stronghold has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

189.    Plaintiff on behalf of Stronghold has no adequate remedy at law.

### FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

190.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of Stronghold in a manner consistent with the operations of a publicly-held corporation.

192.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Stronghold has sustained and will continue to sustain significant damages.

193.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

194.     Plaintiff on behalf of Stronghold has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

195.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Stronghold to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

197.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

198.     Plaintiff on behalf of Stronghold has no adequate remedy at law.

## SIXTH CLAIM

### Against the Defendants Beard, Spence, and Larroudé for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act

199.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

200.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Stronghold shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

201.    Federal law provides Stronghold with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

202.    The plaintiffs in the Securities Class Action allege that the Offering Documents issued in connection with the Company's IPO contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

203.    Stronghold is the registrant for the IPO. Defendants Beard, Spence, and Larroudé were responsible for the contents and dissemination of the Offering Documents.

204.    As issuer of the shares, Stronghold is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

205.    The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

206.    Defendants Beard, Spence, and Larroudé, because of their positions of control and authority as controlling shareholders, officers and/or directors of Stronghold, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Stronghold, including the wrongful acts complained of herein and in the Securities Class Action.

207.    Accordingly, the Individual Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

208.    As such, Stronghold is entitled to receive all appropriate contribution or indemnification from Defendants Beard, Spence, and Larroudé.

## PRAYER FOR RELIEF

209.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Stronghold, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Stronghold;

(c)    Determining and awarding to Stronghold the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Stronghold and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Stronghold and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the Board;

2. a provision to permit the shareholders of Stronghold to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Stronghold restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: September 5, 2023                    Respectfully submitted,


                                    _____Timothy Brown_____
                                    Timothy Brown
                                    **THE BROWN LAW FIRM, P.C.**
                                    Timothy Brown
                                    Saadia Hashmi
                                    767 Third Avenue, Suite 2501
                                    New York, NY 10017
                                    Tel: (516) 922-5427
                                    Fax: (516) 344-6204
                                    tbrown@thebrownlawfirm.net
                                    shashmi@thebrownlawfirm.net

                                    **BRONSTEIN, GEWIRTZ &
                                    GROSSMAN, LLC**
                                    Peretz Bronstein
                                    Eitan Kimelman
                                    60 East 42nd Street, Suite 4600
                                    New York, NY 10165
                                    Telephone: (212) 697-6484

Facsimile: (212) 697-7296
Email: peretz@bgandg.com
eitank@bgandg.com

*Counsel for Plaintiff*

DocuSign Envelope ID: 62C780A5-008C-4363-A474-8D996DD8A2GA

## **VERIFICATION**

I, Tom Wilson, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 31 __ day of August, 2023.

DocuSigned by:

*tom wilson*

923D95E7C5474B9...

Tom Wilson